IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| V. | : | CRIMINAL NO. |
| | : | |
| LEONARD PEARSON RIDGE, IV | : | 21-406 |

## SENTENCING MEMORANDUM

Defendant Leonard Pearson Ridge IV, by and through his attorney, Carina Laguzzi, hereby submits this Sentencing Memorandum in mitigation of sentence in the above-referenced matter. Based on the factors and reasons addressed below, Mr. Ridge respectfully requests a sentence range below his guideline range which would prove to be sufficient, but not greater than necessary, to comply with the statutory directives set forth in 18 U.S.C. §3553(a)(2). The sentencing hearing is currently scheduled for January 4, 2022.

**I.        INTRODUCTION**

Leonard Ridge stands before the Court with sincere and great remorse for his actions in this case, asking for mercy. It is requested this Honorable Court impose a sentence of probation, which will allow Mr. Ridge to continue the path he led before this case as a productive and law abiding member of society with legitimate employment and helpful caregiver to members of his family, as well as a respected member of his community.

## II.      BACKGROUND OF THE CASE

### A.  Facts of the Offense

The facts of the offense have been accurately recounted in the Statement of Offense and were adopted into the record on September 28, 2021 at the change of plea hearing.  It has also been accurately detailed in the facts section of the United States Probation's presentence investigation report ("PSR").  Thus, no further recitation is necessary here.

### B.  Procedural History

Mr. Ridge was arrested without incident in his parents' house on May 20, 2021.[1]

On October 1, 2021, Mr. Ridge appeared before this Honorable Court via video teleconference pursuant to the Coronavirus Aid, Relief, and Economic Relief Act ("CARES ACT")[2] due to the ongoing COVID-19 pandemic, and entered a plea of guilty to Count Two of the Indictment.  Count Two is a violation of 18 U.S.C. § 1752(a)(1)- Entering and Remaining in a Restricted Building or Grounds graded as a misdemeanor.

The case is now pending sentencing.

## III.      SENTENCING IN THE POST-*BOOKER* ERA

---

[1] Mr. Ridge was not first contacted by law enforcement about his arrest warrant, otherwise he would have promptly made arrangements to turn himself in without the need for a formal arrest.

[2] Passed by the 116th Congress and signed into law on March 27, 2020.

2

The defense requests this Honorable Court impose a sentence below the guidelines. Mr. Ridge has an adjusted total offense level with criminal history category I, resulting in a guideline range of **0-6** months imprisonment.[3]

In <u>Booker v. United States</u>, the Supreme Court found the provisions of the Federal Sentencing Reform Act of 1984 making the Guidelines mandatory are incompatible with its Sixth Amendment holding. 543 U.S. 220, 244 (2005). Thus, instead of being bound by the Sentencing Guidelines, the Sentencing Reform Act, as revised by <u>Booker</u>, "requires a sentencing court to consider the Guideline's ranges, but it permits the Court to tailor the sentence in light of other statutory concerns as well" as articulated in 18 U.S.C. § 3553(a). <u>Id</u>. at 245-46 (citations omitted). Accordingly, under <u>Booker</u>, sentencing courts must treat the guidelines as just one of a number of sentencing factors set forth in 18 U.S.C. § 3553(a).

The primary directive in § 3553(a) is for sentencing courts to "impose a sentence sufficient, but not greater than necessary, to comply with the purpose set forth in paragraph 2." Section 3553(a)(2) states these purposes are:

(A)    To reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B)    To afford adequate deterrence to criminal conduct;

---

[3] The United States Probation Department's presentence investigation report has him at an offense level of 4 (PSR, Page 16, ¶ 66). However, for the many reasons below, this guideline range both overstates the defendant's conduct, and is therefore overly punitive. In addition, it is the defense's contention that Mr. Ridge is entitled to a reduction for minor participant which would reduce his total offense level to 2. However, even at this level the guideline range remains at 0-6 months.

(C)   To protect the public from further crimes of the defendant; and

(D)   To provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

In determining a sufficient sentence, § 3553(a) further directs sentencing courts to consider the following factors:

(1)   "the nature and circumstances of the offense and the history and characteristics of the defendants,"  See 18 U.S.C. § 3553(a)(1);

(2)    "the kinds of sentences available," see 18 U.SC. § 3553(a)(3);

(3)   "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." See 18 U.S.C. § 3553(a)(6); and

(4)   "the need to provide restitution to any victims of the offense." See 18 U.S.C. § 3553(a)(7).

Perhaps most importantly, under 18 U.S.C. § 3661, "no limitation shall be placed on the information concerning the background, character, and

conduct of [the defendant] which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence."[4]

Therefore, the directives of Booker, and § 3553(a), make clear that sentencing courts must give "meaningful consideration to the § 3553(a) factors… A rote statement of the § 3553(a) factors should not suffice if, at sentencing, either the defendant or the prosecution properly raises 'a ground of recognized legal merit (provided it has a factual basis) and the Court fails to address it."  See United States v. Cooper, 437 F.3d 324, 329 (3d Cir. 2006)(Citations omitted).  See also United States v. Schweitzer, 454 F.3d 197, 205-06 (3d Cir. 2006)(directing district courts to explain all guideline determinations and final sentences, stating, "[t]here is simply no substitute for on-the-record discussion and deliberation.  It ensures that the parties are fully informed of their rights and obligations and that the appellate court will be able to assess the merits of the final judgment,"); United States v. King, 454 F.3d 187, 196-97 (3d Cir. 2006)(District courts "should observe the requirement to state adequate reasons for a sentence on the record so that this court can engage in meaningful appellate review.").

As another district court judge has observed, "any approach which automatically gives 'heavy' weight to the guideline range comes perilously close to the mandatory regime found to be constitutionally infirm in Booker."  United States v. Jaber, 362 F.Supp. 2d 365 (D. Mass. March 16, 2005((Gertner, J.).

---

[4] This statutory language overrides the advisory policy statements in Part H of the Sentencing Guidelines, which lists as "not ordinarily relevant" to sentencing a variety of factors such as the defendant's age, educational and vocational skills, mental and emotional conditions, drug or alcohol dependence , and lack of guidance as a youth.  See U.S.S.G § 5H1.

Simply put, trial courts may no longer uncritically apple the guidelines.  Such an approach would be "inconsistent with the holdings of the merits majority in Booker, rejecting mandatory guidelines sentences based on judicial fact-finding, and the remedial majority in Booker, directing courts to consider all of the 3553(e) factors, many of which the guidelines either reject or ignore."  United States v. Ranum, 353 F. Supp. 2d 984, 985-86 (E.D. Wisc. Jan 19, 2005)(Adelman, J.). United States v. Ameline, 400 F.3d 646, 655-56 (9th Cir. Feb 9, 2005)(advisory guideline range is "only one of many factors that a sentencing judge must consider in determining an appropriate individualized sentence"), reh'g en banc granted, 401 F.3d 1007 (9th Cir. 2005).

In sum, in every case, a sentencing court must now consider all of the § 3553(a) factors, and not just the guidelines as set forth in § 3553(a)(4)(A), to determine a sentence that is sufficient, but not greater than necessary, to meet the goals of sentencing.  Where the guidelines conflict with other sentencing factors articulated in § 3553(a), these other statutory sentencing factors should generally trump the guidelines.  See United States v. Denardi, 892 F.2d 269, 276-77 (3d Cir. 1989)(Becker, J., concurring in part, dissenting in part)(arguing that since § 3553(a) requires a sentence to be no greater than necessary to meet those purposes violated the statute and its reversible even if within the guideline range).

Accordingly, in this post-Booker era, this Court has discretion to sentence Mr. Ridge below the guideline range based upon a review of the statutory factors set forth in § 3553(a).

## IV.    FACTORS THAT WARRANT MITIGATION OF SENTENCE UNDER 18 U.S.C. § 3553(a)

Leonard Ridge pled guilty to one count of his indictment.  Mr. Ridge admitted his guilt at his change of plea hearing and therefore is credited with acceptance of responsibility, which qualifies him under U.S.S.G. § 3E1.1(a) for a two level decrease in the offense level.  PSR at ¶ 42.  In addition, he pled guilty in a timely manner having decided to accept the government's plea less than one month after the government extended it.[5]

### A.    Factors that Warrant a Variance from the Advisory Sentencing Guidelines

In Booker, the Supreme Court severed and excised 18 U.S.C. § 3553(b), the portion of the federal sentencing statute that made it mandatory for courts to sentence within a particular guidelines range.  Booker, 125 S.Ct at 756. As argued above, Booker has rendered the sentencing guidelines advisory.  Id. Consequently, the Court is free to fashion a sentence, including a probationary one, that is sufficient, but not greater than necessary, to accomplish the goals of § 3553(a)(2).

At Paragraphs 99 and 100, the PSR states there are no factors which warrant a departure from the advisory sentencing guidelines range or a sentence outside of the guidelines system.  Under the principles articulated in United States v. Rita, 127 S.Ct. 2456 (2007), this Court may make its own determination as to

---

[5] Although his offense level does not afford him an additional one-level reduction pursuant to U.S.S.G. § 3E1.1(b)(2), the defense contends the Court should still consider the fact Ridge's notification to authorities of his intention to plea guilty still afforded the government the ability to place its resources elsewhere by avoiding any preparation for trial in this case in fashioning its sentence.

what factors to consider in addition to the advisory Sentencing Guidelines when sentencing a criminal defendant.  The Rita decision held that district courts, when imposing a sentence, do not have to subordinate role to the Sentencing Commission, do not have to defer to the Commission's judgments and policy decisions, and can reach their own judgments regardless of whether they disagree with the Commission's position.  Id. at 2463-64.  A sentencing court may, for example, address arguments that the Guidelines "reflect an unsound judgment or…that they do not generally treat certain defendant characteristics in the proper way."  Id. at 2468.  The Rita Court even stated that, "[a]s far as the law is concerned, the [sentencing] judge could disregard the Guidelines" altogether.  Id. at 2466.

Demonstrably, there are numerous factors which warrant a sentence outside of the advisory guideline range and which should have been referenced in the PSR in light of the mandate set forth in 18 U.S.C. § 3553(a).  After Booker and the Third Circuit's pronouncement in United States v. Cooper, 437 F.3d 324, 331-32 (3d Cir. 2006), sentencing courts must consider each Section 3553(a) factor fully, without particular weight or preference given to the Sentencing Guidelines, in imposing a sentence that is sufficient, but not greater than necessary, to comply with the traditional goals of sentencing of deterrence, the protection of society, retribution, and rehabilitation, as set forth in Section 3553(a)(2).

In fact, "[a] district court's decision to depart from the Guidelines…will in most cases be due substantial deference, for it embodies the

traditional exercise of discretion by a sentencing court." Koon v. United States, 116 S.Ct. 2035, 2046 (1996). A sentencing court must view the Guidelines as "carving out a heartland, a set of typical cases embodying the conduct that each guideline describes." United States v. Iannone, 184 F.3d 214, 226 (3d Cir. 1999). However, where a defendant's conduct "falls outside the typical heartland, the court may consider a departure from the Guideline sentence" pursuant to U.S.S.G. 5K2.0. Id. Precisely because of the institutional advantage which sentencing courts have over appellate courts in taking measure of a defendant's life in order to fashion an appropriate sentence, departure decisions are only reviewed for abuse of discretion. Koon, 116 S.Ct. at 2047-48.

### 1. 18 U.S.C. § 3553(a)(1); History and Characteristics of the Offender

Leonard Ridge just turned 20 years old in November 2021. PSR at Page 2. He has no prior criminal record. Id. at ¶¶ 44-46. The traditional goals of sentencing, as outlined in § 3553(a)(2), are punishment, deterrence, protection of society and rehabilitation. Mr. Ridge is subject to a criminal record for the rest of his life and all of the restrictions and stigmas that come with a criminal record. His name will forever be tied to the actions of January 6, 2021, and he will be continually judged for these actions well after the termination of this case. Even as a young man, he commands the respect of family, friends and neighbors as it evident by the numerous character letters submitted on his behalf. See attached as Exhibit "A."

### a.  Defendant as a Youthful Offender

At the time of the offense, Mr. Ridge was only 19 years old.  Recent studies on brain development and age, coupled with recent Supreme Court decisions recognizing differences in offender culpability due to age, have led some policymakers to reconsider how youthful offenders should be punished.  *Youthful Offenders in the Federal System.*  United States Sentencing Commission. May 2017.   www.ussc.gov/sites/default/files/pdf/research-and-publications/research-piblications/2017/20170525_youthful-offenders.pdf.[6]          The     Sentencing Commission has recognized the role youth may have at sentencing.   Id. Specifically, §5H1.1 provides that age—including youth—

> "may be relevant in determining whether a departure is warranted, if considerations based on age, either individually or in combination with other offender characteristics, are present to an unusual degree and distinguish the case from the typical cases covered by the guidelines. . . ."[7]

The contribution neuroscience has made to the study of youthful offending is significant and continues to evolve.   Id.   Numerous studies using Magnetic Resonance Imaging (MRI) of the brain show the brain goes through two

---

[6] The key findings in the report were based on federal offenders 25 years of age and younger.  Id.

[7] See USSG §5H1.1 (Age (Policy Statement)). After the decision in United States v. Booker, 543 U.S. 220 (2005), under 18 U.S.C. § 3553(a), sentencing courts may also consider age in determining whether and to what extent a variance is warranted. See United States v. Chase, 560 F.3d 828, 830–31 (8th Cir. 2009) (After Booker "factors such as a defendant's age, medical condition, prior military service, family obligations, entrepreneurial spirit, etc., can form the bases for a variance even though they would not justify a departure"); see also United States v. Feemster, 572 F.3d 455, 463–64 (8th Cir. 2009) (120-month sentence based in part on defendant's age (26 years) at time of the instant offense was substantively reasonable where district court determined that a downward variance from 360-month to life guidelines range was warranted); but see United States v. Omole, 523 F.3d 691, 698–700 (7th Cir. 2008) (defendant's 12-month sentence was substantively unreasonable where defendant's young age (20 years) and "lack of understanding that people of his age seem to reflect" were not a "compelling justification" for the substantially lenient sentence).

major processes during adolescence and into young adulthood.  Id.  Among the landmark studies in brain development is a 2005 meta-analysis of all studies completed through 2004 on frontal lobe development and maturation.  Id. referencing Cassandra B. Romine & Cecil R. Reynolds, *A Model of the Development of Frontal Lobe Functioning: Findings From a Meta-Analysis*, 12(4) Applied Neuropsychology 190–201 (2005).  The authors established a model of frontal lobe development to suggest maturation is not complete until the mid-20s. Id.  The results indicated clear differences in the ways and extent to which the frontal lobe was used in decision making.  Id. referencing Silvia A. Bunge et al., Immature Frontal Lobe Contributions to Cognitive Control in Children: Evidence from fMRI, 33(2) Neuron 301–11 (2002).  There has been significant debate among policymakers regarding the age at which a person should be held responsible for their actions because of different stages of brain development.  Id. However, researchers agree development continues into the 20s.  Id. referencing Sara B. Johnson, Robert W. Blum, & Jay N. Giedd, Adolescent Maturity and the Brain: The Promise and Pitfalls of Neuroscience Research in Adolescent Health Policy, 45(3) Journal of Adolescent Health, 216–21 (2009).[8]  It stands to reason, therefore, a youth offender such as Mr. Ridge cannot carry the same culpability as

---

[8] Mary Beckman, Crime, Culpability, and the Adolescent Brain, 305 Science 596–99 (2004); Ronald E. Dahl, Adolescent Brain development: A Period of Vulnerabilities and Opportunities, 1021 Annals of the N.Y. Acad. of Sci. 1–22 (2004); K. Rubia et al., Functional Frontalisation with Age: Mapping Neurodevelopmental Trajectories with fMRI, 24 Neuroscience & Biobehavioral Reviews 13-19 (2000); National Institute of Mental Health, The Teen Brain: Still Under Construction (2011), http://www.nimh.nih.gov/health/publications/the-teen-brain-still-under-construction/index.shtml.

an adult with a fully matured brain.  Ergo, the same sentence an adult in his similar situation as Mr. Ridge is not appropriate for this important reason.

### b.  Caregiver to Family Members

In addition to his full time employment, Mr. Ridge helps several of his family members.  Specifically, he helps his uncle, Malcom Ridge, at work. Malcom Ridge is 78 years old and has been suffering from transient ischemic attacks ("TIA")[9], as a result of cardiac issues over the last couple of years.  As a result, Malcolm has had a hard time maintaining his regular office routine.  Mr. Ridge helps Malcom by doing some of the computer work and as well as some of the day to day responsibilities, such as writing up rent so Malcom can keep coming to the office and feel he is useful.  Mr. Ridge also helps Malcolm with financial investing decisions, which have proved to be successful for him.

Mr. Ridge also helps his elderly paternal grandmother, Carole Ridge, who is 79 years old.  Specifically, Mr. Ridge runs daily errands for her including going to the grocery store, drops off her mail, picks up her prescriptions, and dropping off and picking up her dry cleaning.

Mr. Ridge's mother is remodeling a house for resale, which was left suddenly when his maternal grandfather died in January 2020 unexpectedly.  Mr. Ridge helped in the actual manual labor of the "flip."  This included painting and ripping out old carpeting.

---

[9] The most common underlying pathology leading to TIA and stroke is a cardiac condition called atrial fibrillation, where poor coordination of contraction leads to a formation of a clot in the atrial chamber that can become dislodged and travel to a cerebral artery. en.wikipedia.org/ wiki/Transient_ischemic_attack.

Furthermore, he makes time to help his younger brother with his high school math and accounting work. This was particularly helpful to the family during the COVID-19 pandemic and lock down, when tutors were not readily available.

### 2.        Lack of Danger to the Community

Mr. Ridge does not pose any physical danger to the public, as evidenced by the absence of any criminal record. Also, Mr. Ridge did not participate in any violence in this case. The government has not made any such assertions to the contrary.

### 3.        Prospects for Rehabilitation

The traditional goals of sentencing, as outlined in § 3553(a)(2), are punishment, deterrence, protection of society and rehabilitation. A short probationary sentence in this case is entirely consistent with these traditional goals. He is subject to a criminal record forever. During the time since his arrest, Mr. Ridge has had duties of a being under pre-trial supervision. He has had to visit United States Pre-Trial Services at least once a month, and has never missed an appointment. He has not had any positive drug samples, as he is randomly drug tested. He has maintained employment and has not incurred any new arrests. Consequently, he has demonstrated therefore to the Court that he can remain out of trouble.

### 4.        Cooperation with Law Enforcement

Immediately upon processing after his arrest, he was questioned by agents of the Federal Bureau of Investigation ("FBI").  Mr. Ridge was honest and straight forth about his conduct in his statement.[10]  He did not try to minimize his actions.  Id.  He was described by FBI Special Agents as "polite and likeable."  Id.

### 5.        Herd/Mob Mentality

Another important consideration in fashioning a sentence in this case is the herd issue that occurred on January 6th after the President's speech.  Herd, or mob, mentality is defined as individuals influenced by a larger group. www.webmd.com/mental-health/what-is-a-mob-menatality.   A mob is, in very broad terms, a crowd of people gathered together at a particular time and place, some or many of whom start to engage in destructive and sometimes violent behavior.  Id.[11]   Psychology gives several causes in understanding how mob mentality occurs: (1) deindividuation- when people are part of a group, they experience a loss of self-awareness.  Davies, Nicola, Health Psychology Consultancy, "The Psychology of Mob Mentality", August 9, 2011.  (2) Identity when people are part of a group, they can lose their sense of individual identity. (3) Emotions—being part of a group can lead to heightened emotional states whether it is excitement, anger, or hostility.  (4) Acceptability—behaviors usually seen as unacceptable become acceptable when others in a group are seen carrying

---

[10] As recounted to defense counsel by FBI Agent in a telephone conversation on May 20th.

[11] See also Lee C. Bollinger, *The First Amendment's Original Sin.* 72 U. Chi. L. Rev. 417 (2005).

them out. (5) Anonymity—people feel anonymous within a large group, which reduces their sense of responsibility and accountability.  (6) Diffusion of responsibility—being part of a group creates the perception that violent or unacceptable behavior is not a personal responsibility but a group one.  The larger the group or crowd, the more likely there will be deindividuation and diffusion of responsibility.  Id.

Understanding and addressing mob-based harms, however, presents a number of difficulties. Id.  In collectives such as mobs, people can act in ways they would not ordinarily act, and this is a significant fact in thinking about responsibility and punishment for the harms that ensue. Id.  The question of punishment is particularly pressing in the context of contemporary philosophical work on mobs. Id.  However, when it comes to the question of determining punishment for these harms, they still give primacy to *mens rea* as it relates to individual persons, despite clearly recognizing the *mens rea* element is complicated by the collective dimension of mob activity. Id.

In *The Morality of Groups*[12], Larry May and in *Programming collective control*, Kenneth Shockley, respectively,[13] discussed punishment for mob-based harms fall back on the idea of individual mens rea. Sean Bowden, Sarah Sorial & Kylie Bourne.  *Punishment for Mob-based Harms: Expressing and*

---

[12] Larry May, THE MORALITY OF GROUPS: COLLECTIVE RESPONSIBILITY, GROUP-BASED HARM, AND CORPORATE RIGHTS (Notre Dame, IN: University of Notre Dame Press,1987).

[13] Kenneth Shockley, 'Programming collective control', *Journal of Social Philosophy* 38,3 (2007): 442–455.

*Denouncing Mob* Mentality, Journal of Applied Philosophy.  Volume 38, Issue 3. July 2021; Pp 366-383.  Both May and Shockely recognize the individual *mens rea* element is complicated by the fact that a person's intentional actions in the context of mob activity have a collective dimension to them, either because they are 'group-based', or because they are enabled or constrained by the collective's 'normative authority'. Id.  Bowden, et al criticize May's suggestion that members of mobs have group-based 'pre-reflective intentions because it fails to reflect this complication as to punishment. Id.  Bowden, et al further state it does not seem plausible that a *pre-reflective* intention can account for the complex collective actions of some of the mobs May considers. Id. The collective actions of the Parisian mob in July 1789 that culminated in the taking of the Bastille, for example, required sophisticated divisions of labor, even if decisions regarding who had to do what and when as part of the joint effort had to be made rapidly, and in the situation of action itself. Id.  Moreover, the entire, complex collective action was not transitory, but rather sustained by cooperative effort over a number of days. Id.

A second distinction important to analyze is between shared and collective responsibility. Id.  Shared responsibility refers to the responsibility that attaches to *individuals* in virtue of their being constitutive members of the group, and behaving in ways that enables the production of harm. Id.  Collective responsibility, on the other hand, is not attributed to individuals but rather to the group entity as such. Id.  In this case, the government is proceeding under shared

responsibility (thus not charging certain individuals such as this defendant with conspiracy).  Yet, there is insufficient attention devoted to the manner in which mob intentions arise. Id.  The relation of solidarity between mob members is an indispensable condition for the emergence of mob intentions, the process through which the latter emerge remains mysterious thus explaining why many of the people involved on January 6th assert they do not know why they did what they did. Id.

Regarding responsibility, some mobs are 'cohesive' in some sense, it does not help us understand the kind of responsibility that may be attributed to 'non-cohesive' mobs – which is to say, mobs that are collectively implicated in the production of harms despite not being guided by group-based intentions and beliefs. Id. referencing Larry May, SHARING RESPONSIBILITY (Chicago: University of Chicago Press, 1992), pp. 105-114.  The members of a rioting mob, for example, may not cohere around shared purposes such as storming a castle or demonstrating united resistance to a corrupt or oppressive regime.

By exploring the development of patterns of behavior, these processes have the capacity not only to understand mob actions and to begin solution-focused dialogue within communities, but also to contribute to victims' healing, even where the cases of mob harms are historical. Id.  Specific emphasis could be placed on understanding the way that the mob action came about and, where appropriate, was sustained. Id.  Should such forms of punishment be pursued it would be a way to hold mob members to account, who as individuals

may not have acted, but who nevertheless contributed to the production of harm.
Id. So although Mr. Ridge entered the Capitol, he was not a contributor to the
production of harm.

It has been noted the combination of unemployment and scarcity of
employment opportunities over outsources jobs and immigrants has also led to
financial          survival          for          many          of          the          people          involved.
www.psychologytoday.com/us/blog/facing-trauma-together/202101/the-
psychology-mob-mentality.

### 6.    The Social Media Factor

In determining a sentence, this Court should also look to the social
media problem surrounding the January 6th event.   On October 3, 2021, the
program "60 Minutes" televised an interview with Facebook whistleblower
Frances Haugen, who had anonymously filed complaints with federal law
enforcement that Facebook research had shown how profit margins could be
increased by hate and misinformation propaganda.   www.msn.com/en-
us/news/politics/ex-facebook-manager-alleges-social-network-fed-capitol-riot/ar-
AAP6yef?ocid=msedgntp.[14]   Ms. Haugen, who joined Facebook in 2019, stated
that "Facebook, over and over again, has shown it chooses profit over safety."   Id.
She further stated Facebook "prematurely turned off safeguards designed to thwart
misinformation and rabble rousing after Joe Biden defeated Donald Trump" in the

---

[14] At heart of the matter are algorithms used that Facebook that show up on users' mews feeds showing that
the favor hateful content.  Ms. Haugen stated that a change to the content flow in 2018 contributed to more
"divisiveness and ill will" within the network.  Id.  Facebook used this information as a pattern to sell more
digital ads that generate most of its advertising.  Id.

presidential election last year.  Id.  She alleges this contributed to the January 6th

U.S. Capitol raid.  Id.  Because Facebook dissolved a unit on civic integrity after

the election, Ms. Haugen stated it was then she realized, "I don't trust that they're

willing to actually invest what needs to be invested to keep Facebook from being

dangerous."  Id.

This backlash has intensified since The Wall Street Journal's public

in September of an expose that showed how Facebook's own internal research

concluded that the social network's "attention-seeking algorithms" helped develop

political dissent and had also contributed to mental health and emotional issues

among teenagers.  Id.  Haugen filed at least eight (8) complaints with the

Securities and Exchange Commission.  Id.  This is yet another factor which allows

this Court to fashion a sentence below the sentencing guidelines.

### 7.        Quarantine and its Effect on Mental Health

Another underlying issues of the January 6th incident has been the

global outrage over the pandemic over the coronavirus outbreak.  This has led to

international public panic.[15]  On January 6th, people were feeling the effects of

almost one year of quarantine.  (Pennsylvania, the defendant's home state, went

into an almost statewide lockdown commencing on Monday, March 16, 2020.

www.governor.pa.gov/wp-content/uploads/2020/03/20200319-TWW-COVID-19-

---

[15] AF Sigit Rochadi, Nur Amaina Putri, Zaky Arsy Fauzi. *Public panic over COVID-19 Outbreak: Criticism toward panic theory in collective behavior study.* 10 Technium Soc. Sci. J. 544 (2020).  (This article evaluates the issue of pubic panic over the coronavirus outbreak in Indonesia from March to April 2020.)

business-closure-order.pdf.   People were experiencing emotional disturbance, irritability, insomnia, depression, and post-traumatic stress symptoms after quarantine.   Kathirvel N. Post COVID-19 pandemic mental health challenges. *Asian J Psychiatr*. 2020;53:102430.  doi:10.1016/j.ajp.2020.102430. The long term impact included serious mental health issues such as anxiety, anger, depression, post-traumatic stress symptoms, alcohol abuse, and behavioral changes.   Id.   The headlines from around the country all mirror each other: "Mental health needs surge across Iowa universities"[16]; "'It's not a cold': COVID-19 is causing sickness and meant health issues in Arizona kids"[17]; "Quarantine 'Magnifies' Depression, Mental Health Struggles During COVID-19 Crisis Organizations Seeing Surge In Calls, Need For Mental Health Services" Wisconsin)[18]; "The Implications of COVID-19 for Mental Health and Substance Use"[19].  A KFF Health Tracking Poll from July 2020 also found many adults were reporting specific negative impacts on their mental health and well-being, such as difficulty sleeping (36%) or eating (32%), increases in alcohol consumption or substance use (12%), and worsening chronic conditions (12%), due to worry and stress over the coronavirus. Id.  As the pandemic wears on, ongoing and necessary public health measures expose many people to experiencing situations linked to

---

[16] www.thegazette.com/higher-education/mental-health-needs-surge-across-iowa-universities/

[17] www.azcentral.com/ covid-19-disrupting-school-and-causing-health-problems-az-kids%2F8371055002%2F.

[18] www.wpr.org/quarantine-magnifies-depression-mental-health-struggles-during-covid-19-crisis

[19] www.kff.org/coronavirus-covid-19/issue-brief/the-implications-of-covid-19-for-mental-health-and-substance-use/

poor mental health outcomes, such as isolation and job loss. Id.   During the COVID-19 pandemic, concerns about mental health and substance use have grown, including concerns about suicidal ideation.  In January 2021, 41% of adults reported symptoms of anxiety and/or depressive disorder (Figure 2), a share that has been largely stable since spring 2020. Id.  In a survey from June 2020, 13% of adults reported new or increased substance use due to coronavirus-related stress, and 11% of adults reported thoughts of suicide in the past 30 days. Id.

Mr. Ridge missed out of most of his senior year of high school as a result of the pandemic.  His school, like many, was forced in virtual learning.  Mr. Ridge especially suffered from the emotional aspect of suddenly being cut off from friends and major social events that he has looked forward to for four years including; prom, Senior Spirit Day, and the senior year picnic.

The medical community is well aware of these issues, studying the direct and indirect effects and factors contributing to the decline in people's mental health throughout the COVID-19 pandemic (both during, and after, vaccine administration).  Pandey K, Thurman M, Johnson SD, Acharya A, Johnston M, Klug EA, Olwenyi OA, Rajaiah R, Byrareddy SN. Mental Health Issues During and After COVID-19 Vaccine Era. Brain Res Bull. 2021 Nov;176:161-173. doi: 10.1016/j.brainresbull.2021.08.012. Epub 2021 Sep 3. PMID: 34487856; PMCID: PMC8414813.  The medical community even conducted studies on the effects of the pandemic on social media. Saha K, Torous J, Caine ED, De Choudhury M. Psychosocial Effects of the COVID-19 Pandemic: Large-scale Quasi-

Experimental Study on Social Media. J Med Internet Res. 2020 Nov 24;22(11):e22600. doi: 10.2196/22600. PMID: 33156805; PMCID: PMC7690250.

## 8.      The Presidential Effect

Yet another consideration is that of the former President.  Days after the insurrection, the House impeached Donald Trump for inciting it. www.cbsnews.com/live-updates/trump-impeachment-bipartisan/.   On September 29, 2021, the House Committee investigation regarding the January 6th occurrence at the U.S. Capitol issued additional subpoenas to former Preside Donald Trump allies and several organizers of the rally.   www.nbcnews.com/politics/politics-news/jan-6-comittee-subpoenaws-rally-organizers-trump-allies-n1280384.     The panel leading the investigation sought the subpoenas from various sources including: Katrina Pierson, a former Trump campaign aide who was reported to have a been a liaison between the White Hose and rally organizers; and Maggie Mulvaney, a niece of former top Trump aide Mick Mulvaney who the panel has stated worked directly with rally organizers and communicated with the White House.  Id.[20]  The panel has already subpoenaed and set a date for depositions for former White House strategist Steve Bannon, former White House chief of staff Mark Meadows, former social media director Dan Scavino and Kashyap Patel, chief of staff to former President Trump's defense secretary.

The panel is looking for how the preceding rallies and bus tours were planned and funded for participation.  Id.  In addition, it is looking at the

---

[20] "Rep. Bennie Thompson, D-Miss., the committee's chair, said in a statement that the subpoenas are an effort to collect information from the organizers, in particular, to understand 'how various individuals and entities coordinated their activities leading up to the events of January 6, 2021.'"  Id.

groups' social media activities and communications between law makers and Trumps officials.  Id.  Issuing subpoenas for some of Trump's closest advisers signals an aggressive approach as the requested documents include records related to the Trump administration's plans to discredit the election and dismiss the Electoral College count.  Id.

On October 20, 2021, CBS News reported that Brian Murphy, the former Acting U.S. Undersecretary for Homeland Security for Intelligence and Analysis. He stated that those tasked with were "not looking for signs of violence online."  www.yahoo.com/former-trump-official-speaks-january-194201416.html. As a government whistleblower, he stated to Nicole Sganga, he was ordered to alter his intelligence gathering process.  He stated that no one was looking for those who were openly talking about violence against the government.  Id.  Ego, even the Capitol Police were ill prepared to stop any insurgency into the Capitol building, though the chatter online was there.  Id.  Had the Capitol Police received this information and had greater numbers of law enforcement to prevent even the "casual enterer" like Mr. Ridge, he would have been turned away at the door and this incident would never have occurred.  It was reported on December 15, 2021/, Mitch McConnell, the Senate Minority Leader, was closely monitoring what happened with the investigation into January 6th as text messages came out from former White House chief of staff Mark Meadows claiming several Republican leaders had reached out to President Trump before January 6th requesting added

security.      www.msn.com/en-us/news/politicsmcconnell-says-january-6-probe-revelations-are-interesting/vi-AARQp4I?ocid=msedgntp.

### 9.      Other considerations

Finally, the defense asks this Court to look deep into who Mr. Ridge is as a person and how he acts in his daily life, not just on January 6, 2020.  Mr. Ridge has made time to be involved in political issues, which has ceased after the January 2021 incident.  During a time when most teenagers and young adults dream only of being "influencers" on social media platforms for mundane or trifle reasons, there is a great respect for his peaceful political activism.  His interest in politics is a good thing and but for entering the Capitol on January 6th, should be applauded.

The defense stresses the aforementioned issues are not presented as excuses for the defendant's actions but rather to help this Court understand why these overreaching national issues all contributed to Mr. Ridge's actions.  It is the defense contention that, but for the culmination of all of these events, Mr. Ridge would not be before the Court.[21]  Consequently, due to all of these considerations, this Court has discretion to sentence Mr. Ridge based upon a review of the statutory factors set forth in § 3553(a) below the guideline range.

---

[21] Another defendant also sentenced by this Honorable Court, Andrew Ryan Bennett stated he was not thinking clearly and had been "pumped up on adrenaline" when storming the Capitol.  *Fed, Judge Questions Whether Jan. 6 Rioters Are Treated Unfairly Compared with George Floyd Protestors.* www.newsmax.com/politics/capitol-breach-sentencing/2021/10/01/id/1038805/.

## V.     GUIDELINE CONSIDERATIONS IN SENTENCING

Sentencing courts must give "meaningful consideration to the § 3553(a) factors… A role statement of the § 3553(a) factors should not suffice if, at sentencing, either the defendant or the prosecution properly raises 'a ground of recognized legal merit (provided it has a factual basis) and the Court fails to address it."   See <u>United States v. Cooper</u>, 437 F.3d 324, 329 (3d Cir. 2006)(Citations omitted).   See also <u>United States v. Schweitzer</u>, 454 F.3d 197, 205-06 (3d Cir. 2006)(directing district courts to explain all guideline determinations and final sentences, stating, "[t]here is simply no substitute for on-the-record discussion and deliberation.   It ensures that the parties are fully informed of their rights and obligations and that the appellate court will be able to assess the merits of the final judgment,"); <u>United States v. King</u>, 454 F.3d 187, 196-97 (3d Cir. 2006)(District courts "should observe the requirement to state adequate reasons for a sentence on the record so that this court can engage in meaningful appellate review.").

Since the Guidelines are now advisory, appellate review of sentencing decisions is limited to determining whether they are "reasonable," and an abuse-of-discretion standard applies to appellate review of sentencing decisions. <u>Gall v. United States</u>, 552 U.S. 38, 46 (1997) referencing <u>Booker</u>, supra. A district judge must consider the extent of any departure from the Guidelines and must explain the appropriateness of an unusually lenient or harsh sentence with sufficient justifications. <u>Id</u>.   The decisions of the Third Circuit make plain that

reasonableness is the description given to "the familiar abuse-of-discretion standard" that "applies to *appellate* review" of the trial court's sentencing decision. Holguin-Hernandez v. United States, 140 S. Ct. 762, 766 citing Gall, 552 U.S. at 46, 128 S. Ct. 586, 169 L. Ed. 2d 445 (emphasis added); see Kimbrough v. United States, 552 U. S. 85, at 90-91, 128 S. Ct. 558, 169 L. Ed. 2d 481(dealing with the district court's decision-making); Rita v. United States, 551 U. S. 338, 351, 127 S. Ct. 2456, 168 L. Ed. 2d 203 (2007); Booker, 543 U. S. at 261, 125 S. Ct. 738, 160 L. Ed. 2d 621.

In sum, in every case, a sentencing court must now consider all of the § 3553(a) factors, and not just the guidelines as set forth in § 3553(a)(4)(A), to determine a sentence that is sufficient, but not greater than necessary, to meet the goals of sentencing. Where the guidelines conflict with other sentencing factors articulated in § 3553(a), these other statutory sentencing factors should generally trump the guidelines. See United States v. Denardi, 892 F.2d 269, 276-77 (3d Cir. 1989)(Becker, J., concurring in part, dissenting in part)(arguing that since § 3553(a) requires a sentence to be no greater than necessary to meet those purposes violated the statute and its reversible even if within the guideline range).

### A.    Need for Punishment

Even minor criminal offenses require a culpable defendant to be punished. In this case, defense submits to the Court that Mr. Ridge has already been punished. Inside the Rotunda, he actually heard an unformed Capitol Police officer say out loud to him and others, "Just don't break anything." Had the

officer told people there when Pearce was present that they had to leave, he would have complied immediately.  Mr. Ridge is now subject to a criminal record for the rest of his life.  The consequences of his actions will follow him forever.  When Googling his name, he will always be tied to the actions of January 6th.  The conviction and public humiliation of this is in and of itself is punishment enough.

### B.    Deterrence

The deterrence factor is both for specific deterrence of this defendant versus general deterrence for the public.  Mr. Ridge fully cooperated with the FBI during his arrest and gave a full, detailed statement as to his participation.  Mr. Ridge did not enter by force into the Capitol; he did not break any door, window or other entry point to gain access.  There were no barricades or signs warning against trespassing, or that the building is a restricted area.  It is undisputed he did not contribute toward any violence against any law enforcement or other citizens, nor did he participate in any destruction of property in the time he was inside.  While inside, at no time did anyone of authority tell him, or others around him, that the public was not allowed inside.

### C.    Protecting Public[22]

---

[22] The January 6th Committee issued new subpoenas as late as September 30, 2021, into their investigation into the Capitol building insurrection as discussed by Congresswoman Zoe Lofgren (Democrat from California who serves on the Committee) on MSNBC.  www.msn.com/en-us/news/politics/trump-s-not-innocent-january-6th-committee-issues-new-subpoenas/vi-AAOYdUD?ocid=msedgdhp&pc=U531.    It remains an active investigation and are directed at the people who sought the permits and funded it.  Id.  Some people from the Trump campaign, such as Katrina Peterson, were named in those subpoenas.  Id.  The purpose of the investigation was to find out the communication form the organizers and the White House and where the funding came from.  Id.  Second impeachment also was led from communication from Ms. Peterson and Donald Trump.  Id.  The investigation is to find out whether the White House knew ahead of time that there was a plan to breach the Capitol building.  Id.  The purpose of the committee is to find this out.  Id.

As argued above, Mr. Ridge did not participate in any violent act during the January 6th event.  He did not participate in any destruction of property. Accordingly, he does not present a danger to his community.

## D.  Avoiding Inequitable Disparities in Sentences

Although some defendants charged with their actions during the Capitol insurrection have received sentences that are higher than what defense is requesting here, it is important to note differences with those defendants.

The government has taken the position on several cases that "the need to deter others is especially strong in cases involving domestic terrorism." See United States v. Paul Allard Hodgkins, (where the government is seeking an 18-month prison term on one count of obstructing an official proceeding).  See Criminal Docket No. 1:21-cr-188.  Merriam Webster defines terrorist as "an advocate or practioneer of terrorism as a means of coercion."  www.merriam-webster.com/dictionary/terrorist.  Terrorism is defined as "the systematic use of terror especially as means of coercion."  Id. at "terrorism."    It is noteworthy in that case AUSA Mona Sedky also argued to Judge Randolph D. Moss that despite many of the individuals involved in this case, their views make them "unique among criminal in the likelihood of recidivism."  However, this statement is not based on any actual statistics or study and therefore, is not a fair or accurate statement to be considered with regards to Mr. Ridge.

In United States v. Erik Rau and United States v. Derek Jancart, this Court imposed a sentence of forty-five (45) days incarceration on each of the

defendants.   See Criminal Case No. 1:21-cr-00467.   It is important to note both Mr. Rau and Mr. Jancart physically (and arguably violently) pushed through a police line and then videotaped themselves entering after having seen rioters entering forcefully and violently past law enforcement officials.   See Id. at Docket Doc. No. 9, Page 3.   Mr. Ridge entered peacefully and through a door that was no barricaded or marked with a no trespassing sign.   Yet, he has accepted responsibility and has not refused to acknowledge that what he did was wrong as so many others have done.[23]   Furthermore, they went to the Speaker's conference room and posted a photo on Facebook.   Mr. Ridge did not engage in any such intrusive behavior.

### E.   Need for the Sentence to Reflect the Seriousness of the Offense

As stated above, the nature of Mr. Ridge being subject to a criminal record has been, and will continue be, a severe punishment for him.   Under 18 U.S.C. § 3661, "no limitation shall be placed on the information concerning the background, character, and conduct of [the defendant] which a court of the United

---

[23] Boyd Camper, a 54 year old real estate investor from Montana, acknowledged he had enters into a restricted area when he made his way to the rotunda on January 6th but argued that law enforcement "weren't even trying to stop us' from entering into the Capitol.  www.cnn.com/2021/08/17/politics/capitol-rioters-defiant-guilty-pleas/index.html. See also Criminal No. 1:21-cr-325.   He stated, 'The door was literally held up by someone who appeared to be a person of authority.'   Id.   (The government has recommended a sentence of incarceration for Mr. Camper for several reasons including the fact that his military service made it more shocking that he entered a restricted building, and he attempted to bury evidence- video footage recorded on his GoPro.  See Doc. No. 30, Pages 6-7 & 10).   John Lolos made another similar comment during his August 4th plea stating police officials were waiving him into the crypt area of the Capitol.   Id.   See Criminal No. 1:21-cr-243.   (The government has requested an incarceration period for Mr. Lolos for several reasons including a prior criminal history involving threats, and his unruly conduct while inside the Capitol building.   See Doc. No. 32, pages 2-3.)   Both of these are clearly distinguishable from Mr. Ridge and his actions.

States may receive and consider for the purpose of imposing an appropriate sentence."[24]

## VI.      FACTORS MAKING AN IMPRISONMENT SENTENCE UNNECESSARY

The four options for punishment pursuant to the Sentencing Table, in increasing order of severity, are: probation only (i.e., zero months of confinement); probation that includes a condition or combination of conditions, such as home or intermittent confinement; imprisonment followed by a term of supervised release with a condition or combination of conditions that substitute community confinement or home detention (split sentence); and imprisonment only.  Guidelines Manual, Chapter 5, Part A.  See also Courtney Semisch, U.S. Sentencing Comm'n, Alternative Sentences in the Federal Criminal Justice System (2015).

### A.      COVID 19 Crisis Concern

The initial outbreak of coronavirus disease 2019 (COVID-19), caused by the novel severe acute respiratory syndrome coronavirus 2 (SARS-CoV-2), was first reported in December 2019 in Hubei Province, China. Montoya-Barthelemy AG, Lee CD, Cundiff DR, Smith EB. COVID-19 and the Correctional Environment: The American Prison as a Focal Point for Public Health [published online ahead of print, 2020 Apr 17]. Am J Prev Med. 2020;S0749-3797(20)30144-6. doi:10.1016/j.amepre.2020.04.001.  It has since been declared a pandemic by

---

[24] This statutory language overrides the advisory policy statements in Part H of the Sentencing Guidelines, which lists as "not ordinarily relevant" to sentencing a variety of factors such as the defendant's age, educational and vocational skills, mental and emotional conditions, drug or alcohol dependence , and lack of guidance as a youth.  See U.S.S.G § 5H1.

the World Health Organization, with an increasing velocity of deaths and diagnoses in the U.S.   Id.   As of June 4, 2020, COVID-19 has infected 161,513,458 million people worldwide resulting in 3,352,109 deaths.   World Health Organization (WHO), *Coronavirus (COVID-19),* https://covid19.who.int.

Prisoners and correctional staff share an environment known to amplify, accelerate, and act as a reservoir for outbreaks of respiratory disease. American Prison, supra.  As a respiratory-borne illness, the rate of transmission is largely dependent upon the extent of respiratory contact between individuals. Id. The novel coronavirus that causes COVID-19 is highly contagious.  It spreads from person to person through respiratory droplets and close personal contact.  Id. People who are asymptomatic or pre-symptomatic can unknowingly transmit the virus, making it particularly difficult to slow its spread. Id.

Detention settings are extremely susceptible to rapid and disastrous spread of infectious disease, owing to both environmental and host factors—a point extensively documented by the historical spread of influenza, tuberculosis, and other respiratory pathogens. Id. citing Centers for Disease Control ("CDC"). Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities. www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html. Accessed March 29, 2020 and Maruschak LM, Sabol WJ, Potter RH, Reid LC, Cramer EW. Pandemic influenza and jail facilities and populations. Am J Public Health. 2009:99 (suppl 2):S339–S344. doi: 10.2105/ajph.2009.175174.  Crowding,

inadequate ventilation, and security issues all contribute to the spread of infectious disease in jails and prisons.   Martin Kaste, *Prisons and Jails Worry About Becoming Coronavirus 'Incubators'*, NPR (Mar. 13, 2020), https://www.npr.org/2020/03/13/     815002735/prisons-and-jails-worry-about-becoming-coronavirus-incubators.   Consequently, in August 2020, Attorney General William Barr released a memo to the Bureau of Prisons ("BOP") with instructions to prioritize home confinement as an appropriate response to the COVID-19 pandemic. FEDERAL BUREAU OF PRISONS, COVID-19 Home Confinement Information, https://www.bop.gov/coronavirus.   Ergo, the COVID-19 pandemic by that time was already a major concern and the BOP was surely aware of this fact.   See Judge Rufe Memorandum Opinion, Criminal No. 94-cr-353; Doc. No. 5557, Page 7.   2020 U.S. Dist. Lexis 139343.

Although the rate of COVID-19 infections per 1,000 people in the United States is currently 13.55, in BOP facilities that rate is at least 74.13. See BOP-Reported Positive Tests for COVID-19 Nationwide, Federal Defenders of New York, https://federaldefendersny.org/ (last visited August 3, 2020). However, as explained more below, these numbers are artificially low.  What is most disturbing is that the BOP's official numbers found on the website are drastically underreported.  For example, as of November 9, 2020, the website reported 25 inmates as infected with the virus at the Federal Detention Center in Philadelphia ("FDC"); when a letter from the Department of Justice to Judge Anita Brody with regards to <u>Timothy Brown, et al. v. Warden Keven Pistro</u>, Class

Action Case No. 20-cv-1914-AB shows that 80 inmates were infected as of that date.   See Doc. No. 125.   Likewise at FCI Cumberland in Maryland, as of November 22, 2020, the website stated only one inmate and three staff members were infected when in fact the number of infected inmates was 17 (with more test results outstanding).

While visits at the FDC have been suspended several times since March 2020 in an attempt to reduce the spread of the virus, it has not done an adequate to contain it.   www.bop.gov/locations/institutions/phl/.[25]   However, the Bureau of Prisons has not made changes to protocols that require prisoners to buy their own cleaning supplies.   Brown, et al. v. Marler, 20-cv-1914, Page 17.   On approximately April 1, 2020, the FDC began a two week lockdown during which inmates endure punitive restrictions including twenty-three (23) hour lockdowns. Id. at Page 27.   Cells hold two persons and, at a standard size of approximately 100 square feet, make social distancing impossible.   Id.   Even under the lockdown imposed, a person will come into close contact with 15-20 other people every day. Id. at Page 28.   This is true of most federal facilities.

While vaccines have offered some hope for the future, this pandemic is far from over especially for thousands of federal inmates and detainees who have not yet had the opportunity to be vaccinated.   This is also true for the issue of variants which still cause a large threat to our entire world population. Carl Zimmer: *Scientists warn U.S. lawmakers about the continued threat of*

_____

[25] Once social visit restrictions were lifted in mid-October 2020, they had to be suspended again by the end of October as an outbreak rose in late October and continued into early November 2020.

*coronavirus variants.*   The New York Times, May 12, 2021. https://www.nytimes.com/2021/05/12/science/covid-variant-mutation-tracking.html.  Even for prisoners who have been vaccinated, courts have ordered compassionate release including risk of infection from a variant.  United States v. Michael Deshone Matthews, 2021 WL 3883735, No. 15-CR-118, E.D. Calif., Mueller, C.J., Aug. 31, 2021.  This is especially a viable concern now as the Omicron variant beings to sweep the nation and the world. www.cnn.com/2021/11/25/world/covid-variant-south-africa-immune-evasion-transmissibility/index.html.[26]

### 1.   Specific COVID-19 concerns

In spite of being vaccinated, Mr. Ridge's mother contracted COVID-19 late last year.[27]  Due to complications with pre-existing lung issues, Mrs. Ridge was hospitalized and continues to suffer from the after effects of exposure to COVID.  These after effects have been quite severe and include bradycardia and a 2nd degree heart block.  Therefore, in this case, if Mr. Ridge were to be incarcerated and contract COVID-19 he could reinfect his mother, which could be fatal for her.  According, for this reason alone the defense argues imprisonment is not an appropriate punishment for Mr. Ridge.

### B.   Lack of Danger to Community

---

[26] David McKenzie and Ghazi Balkiz, CNN *A new COVID-19 Variant could show immune evasion and enhanced transmissibility, South African scientists warn.* Fri November 26, 2021.  Professor Tulio de Oliveira, the director of the Center for Epidemic Response and Innovation, said the variant has "many more mutations than we have expected," adding it is "spreading very fast and we expect to see pressure in the health system in the next few days and weeks."

[27] Although not the client, defense counsel has received written permission from Mrs. Ridge on October 19, 2021, to discuss her medical history and ongoing issues with this Court.

Mr. Ridge is not a physical danger to the public, as evidence by the absence of any criminal record and the lack of violence and threats in this matter. Imprisonment is therefore not necessary to protect the public from his actions.

> **C.**      **Imprisonment would not serve any purpose to provide Defendant with any necessary vocational training, education, or other correctional training as it is not necessary in this case**

Mr. Ridge is a high school graduate from Neshaminy High School in Langhorne, Pennsylvania. He therefore does not require any education training that prison could afford him. He works full time as an office worker at his family business "Top of the Ridge" which manages housing 285 homes. He helps the tenants learn where things are and to get around when they move into the community. Pearce has also been helping tenants during the pandemic with rent relief, occupancy permits, residency regarding school district and census paperwork through "BERA" (Emergency Rental Assistance in Bucks County). This additional work is helping Pearce learn the logistics of the business in running the organization. Accordingly, he does not require any vocation training. 18 U.S.C. § 3553(a).

Mr. Ridge has a special monetary fund set aside for higher education. After graduating high school, he has put off college due in large part to the ongoing COVID-19 pandemic and the reality classes would remain virtual. However, he does have plans to return to school. He understands any other misstep could result in being jailed and thus missing out on the opportunity to advance his studies. Id.

Finally, he does not abuse alcohol or narcotics. Accordingly, he does not require any addiction or rehabilitative programs, or other correctional treatment which may be offered in prison. Id.

### D.    Imprisonment Could Be Detrimental to Ridge's Future

Although youthful offenders have the highest recidivism rate of any other federal offender group, the most common offenses for re-arrest are assault and drug trafficking. U.S.S.G. Commission, May 2017, at Page 49. Yet subjecting Mr. Ridge to an imprisonment term, however short, could present him drug use and physical abuse he has never had ever in his life. It will also subject to him to older, more dangerous offenders which could lead to bodily assaults and abuse that could negatively affect him his entire life. Studies show high levels of assault and verbal abuse in confinement institutions. O'DONNELL, I.A.N. and Edgar, K., 1999. Fear in prison. *The Prison Journal*, *79*(1), pp.90-99. See Ireland, J.L., 1999. Bullying behaviors among male and female prisoners: A study of adult and young offenders. *Aggressive Behavior: Official Journal of the International Society for Research on Aggression*, *25*(3), pp.161-178. There is also the issue of physical and verbal abuse by prison staff. Fathi, D.C., 2010. The challenge of prison oversight. *Am. Crim. L. Rev.*, *47*, p.1453. For this issue alone, the defense requests this Court not impose a term of imprisonment.

VII.        **OBJECTIONS TO THE PRESENTENCE INVESTIGATION REPORT[28]**

### A.  Adjustment for Role in the Offense

The defense objects to the failure of the PSR to adjust downward for role in the offense pursuant to § 3B1.2[29].

Pursuant to U.S.S.G. 3B1.2, the Mitigating Role provides:

Based on the defendant's role in the offense, decrease the offense level as follows:

> (a) If the defendant was a minimal participant in any criminal activity, decrease by 4 levels.
>
> (b) If the defendant was a minor participant in any criminal activity, decrease by 2 levels.

In cases falling between (a) and (b), decrease by 3 levels.  The commentary states that a minimal participant adjustment generally applies to those individuals who lacked knowledge of understanding of the scope and structure of the enterprise and of the activities of others. U.S.S.G. 3B1.2(a) app. note 1.  "The Third Circuit has stated that there are two perquisites for the application of section 3B1.2: 'multiple participants and a differentiation in levels of culpability.'"  United States v. Ortiz, 31 F.Supp.2d 469, 471 (citing Isaza-Zapata, 148 F.3d at 239).

The Guideline commentary contains a non-exhaustive list of factors for a sentencing court to consider include, the defendant's understanding of the

---

[28] As of the date of this filing December 22nd, the final presentence investigation report has not been received.  Counsel includes this section based on the initial draft of the report received on November 24th.

[29] Even if the Court grants a mitigation role reduction in offense level, defense understands there would be no change to his guideline range calculation of 0-6 months in Zone A.

scope and structure of the criminal activity, whether the defendant was involved n the planning or organizing of the activity, the benefits he derived from the criminal activity and whether he exercised any decision making authority.  United States v. Ruiz, 999 F.3d 742 (1st Cir. 2021).  See United States v. Presendieu, 880 F.3d 1228, 27 Fla. L. Weekly Fed. C 527 (11th Cir. 2018).

When looking at Mr. Ridge's individual conduct, he was clearly a minimal participant, and is entitled to the four level reduction (or the three level reduction).  He did not enter the building using violence or force.  He did not break any door, window, or participate in any destruction of property while inside the building.  He did not entice anyone into further crimes or in participating in any violent act, or other criminal conduct.  Although the government may argue that applying a four level reduction here would trigger this reduction for many other defendants, the application notes does not discuss how many defendants in an offense can received this reduction.  Instead the relevant question is whether a defendant is a minor or minimal participant in relation to the relevant conduct attributed to him/her.  United States v. Stroman, 661 F. App'x 600 (11th Cir. 2016).  Taking these factors into consideration, Mr. Ridge has demonstrated he was less culpable than other participants and therefore his total offense level should be reduced by four (4) levels.  See PSR at ¶38.

**VIII.        CONCLUSION**

        For all the foregoing reasons, we urge this Court to consider Mr. Ridge's cooperation with law enforcement, his remorse and apologies, the specific issues and considerations addressed in this memorandum and impose a diminutive probationary term allowing him to continue in the positive and law abiding path he lived prior to this incident.


        Respectfully submitted,


        */s/ Carina Laguzzi*
        CARINA LAGUZZI, ESQ.
        Counsel for Defendant Ridge

DATED: December 22, 2021

## <u>CERTIFICATE OF SERVICE</u>

I, CARINA LAGUZZI, certify that on this <u>22nd</u> day of December, 2021, I have served a copy of the attached defendant's Sentencing Memorandum via electronic filing, thus making it available for downloading and printing, upon the following parties:


Michael Friedman
Assistant United States Attorney
555 4th Street NW
Washington, D.C. 20530

Danielle Rosborough
Assistant United States Attorney
555 4th Street NW
Washington, D.C. 20530

The Honorable James E. Boasberg
U.S. District Court
333 Constitution Avenue NW
Washington, D.C. 20001


/s/ Carina Laguzzi
CARINA LAGUZZI, ESQUIRE
Attorney for Defendant Ridge